Filed 1/11/22  City of Chino v. Bosler CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF CHINO et al., | C092140 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2019-80003140-CU-WM-GDS) |
| v. | |
| KEELY MARTIN BOSLER, as Director, etc., et al., | |
| Defendants and Respondents. | |

California's redevelopment agencies were dissolved during a deep economic recession that occurred a decade ago.  (*Cuenca v. Cohen* (2017) 8 Cal.App.5th 200, 207 (*Cuenca*); *County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42, 44.)  In dissolving the redevelopment agencies, the Legislature recognized that a substantial number of enforceable obligations made in connection with redevelopment projects required continued funding.  (*Cuenca,* at p. 207; Health & Saf. Code, § 34191.4, subd. (b)(2)(C)(i).)[1]  As part of the statutory scheme governing dissolution of the

---

[1]     Undesignated statutory references are to the Health and Safety Code.

1

redevelopment agencies, the Legislature specified that enforceable obligations may be paid only under the oversight of the Department of Finance (DOF) and State Controller. (*City of Emeryville v. Cohen* (2015) 233 Cal.App.4th 293, 298-299 (*City of Emeryville*).)

Here, the City of Chino and the Successor Agency to the Redevelopment Agency of the City of Chino (collectively, the City) unsuccessfully attempted three times to convince DOF that various agreements reached more than 25 years ago constituted enforceable obligations under section 34191.4, subdivision (b)(2)(C)(i). The City sought writ relief in superior court to compel DOF to pay the purported enforceable obligations. After hearing the matter, the trial court issued a judgment in which it agreed with DOF's conclusion that none of the promissory notes relied upon by the City constituted enforceable obligations. The City appeals.[2]

In its opening brief, the City contends (1) the trial court erroneously denied the City's request for judicial notice, (2) the trial court improperly relied on two schedules produced by DOF, (3) the trial court erred in determining that most of the agreements between the City and third parties did not sufficiently relate to infrastructure projects, (4) the trial court erred in finding the City had not adequately showed how much the City actually paid to third party contractors, and (5) the trial court erred in concluding that the

---

[2]     Respondents on appeal are Keely Martin Bosler, in her capacity as director of the California Department of Finance, the California Department of Finance, Ensen Mason in his official capacity as San Bernardino County Auditor-Controller/Treasurer/Tax Collector, and the Oversight Board of the Successor Agency of the Chino Redevelopment Agency. The trial court noted that "Respondents San Bernardino County Auditor Controller/Treasurer/Tax Collector, and Oversight Board of the Successor Agency to the Chino Redevelopment Agency have filed a statement agreeing not to oppose the [City's] Petition and to comply with any judgment or final ruling of the Court." Consistent with this position, DOF and Bosler are the only respondents who have filed briefing on appeal. For the sake of simplicity, further references to DOF include both the California Department of Finance and its director, Keely Martin Bosler.

inclusion of some administrative and salary costs invalidated entire cooperation agreements even though the remainder related to allowable costs.

Relying on our decision in *City of Brentwood v. Department of Finance* (2020) 54 Cal.App.5th 418 (*City of Brentwood*), DOF argues those contracts with third parties that predate the cooperation agreements could not have arisen "under" those subsequent cooperation agreements. In *City of Brentwood*, this court held that "the word 'under' is most naturally read to mean that third party contracts to build an infrastructure project must be entered into 'pursuant to' or 'by reason of the authority of' an agreement by the [redevelopment agency] to reimburse the city." (*Id.* at p. 430.) In its reply, the City acknowledges that it is bound to the holding in *City of Brentwood*.[3] Thus, the City limits its argument to the four projects in this case that took place after the corresponding cooperation agreements were signed.

We conclude that the trial court did not err in determining that the City failed to meet its burden to show how much it actually paid to third parties under the four projects remaining in contention. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### *Dissolution of California's Redevelopment Agencies*

In a prior decision, this court recounted that, "[i]n the midst of California's fiscal emergency in 2011, the Legislature enacted two measures that implemented the dissolution of the roughly 400 redevelopment agencies then in existence. (Assem. Bill 1X 26 & Assem. Bill No. 27 (2011-2012 1st Ex. Sess.) enacted by Stats. 2011, 1st Ex. Sess. 2011-2012, chs. 5-6 (Assembly Bill 1X 27); see generally [*California Redevelopment Assn. v.*] *Matosantos* [(2011)] 53 Cal.4th [231,] 241, 245-246 [(*Matosantos I*)].) Assembly Bill 1X 26 required the redevelopment agencies to conclude

---

[3] The City's opening brief does not mention *City of Brentwood* even though this court's decision predated the filing of the opening brief.

3

their activities and dissolve.  (*Matosantos I,* at p. 241.)  Although Assembly Bill 1X 27 would have allowed redevelopment agencies to continue if they paid into funds benefitting schools and special districts, the California Supreme Court struck down this alternative as conflicting with the California Constitution's prohibition on requiring such payments.  (*Matosantos I*, at p. 242; Cal. Const. art. XIII, § 25.5.)  After *Matosantos I*, redevelopment agencies had no option but to wind down and dissolve.  (*City of Emeryville, supra*, 233 Cal.App.4th at p. 298.)

"Winding down California's redevelopment agencies and their projects proved to be no simple task.  A year after enacting Assembly Bill 1X 26, the Legislature passed Assembly Bill 1484 to clarify and tighten restrictions on the funds from redevelopment projects.  (Stats. 2012, ch. 26, §§ 6-35.)  In addition to winding down the redevelopment agencies, the Legislature also eliminated the tax increment.  Subdivision (a) of section 34189 provides in pertinent part:  'all provisions of the Community Redevelopment Law that depend on the allocation of tax increment to redevelopment agencies, including, but not limited to, Sections 33445, 33640, 33641, and 33645, and subdivision (b) of Section 33670, shall be inoperative.'

"Although the Legislature eliminated California's redevelopment agencies, it provided for the continuing validity of enforceable obligations previously created by the redevelopment agencies.  [E]nforceable obligations include court judgments and settlement agreements.  (§ 34171, subd. (d)(1)(D).)  To ensure that claimed enforceable obligations met the criteria set forth in the Dissolution Law, the Legislature provided that '[e]ach oversight board . . . has a fiduciary duty towards "holders of enforceable obligations and the taxing entities that benefit from distributions of property tax" (§ 34179, subd. (i)) to carry out its duties, which include the duty to review specified actions by the successor agencies, including "[e]stablishment of the Recognized Obligation Payment Schedule."  (§ 34180, subd. (g).)  The recognized obligation payment schedule (ROPS) is "the document setting forth the minimum payment amounts

4

and due dates of payments required by enforceable obligations for each six-month fiscal period . . . ." (§ 34171, subd. (h).) The successor agency has a duty to "[c]ontinue to make payments due for enforceable obligations." (§ 34177, subd. (a).) Thus, to help ensure the orderly windup and dissolution of the redevelopment agencies, the ROPS lists what remaining enforceable obligations exist.

" 'To ensure each ROPS is accurate, both the [DOF] and the . . . State Controller . . . have the authority to require documentation of purported enforceable obligations, and they and any "taxing entity" have authority to sue "to prevent a violation under this part . . . ." (§ 34177, subd. (a)(2).) The [DOF] also has authority to "review an oversight board action taken pursuant to" Assembly Bill 1X 26. (§ 34179, subd. (h).)' (*City of Emeryville, supra,* 233 Cal.App.4th at pp. 298-299.)

"Under the Dissolution Law, successor agencies could either retain responsibility for the 'housing functions' previously performed by the redevelopment agencies, or transfer the responsibility to a 'housing successor.' (§ 34176, subd. (a)(1) & (3).) If a successor agency transferred responsibility to a housing successor, the housing successor assumed 'all rights, powers, duties, obligations, and housing assets,' except for 'any amounts on deposit in the [Housing Fund] and enforceable obligations retained by the successor agency.' (*Id*. subd. (a)(1).) DOF is charged with responsibility to review whether a 'transferred asset is deemed not to be a housing asset,' in which case it must be returned for allocation to the taxing entities. (*Id*. subd. (a)(2).)

"Under section 34177, 'Successor agencies are required to [¶] . . . [¶] (d) Remit unencumbered balances of redevelopment agency funds to the county auditor-controller for distribution to the taxing entities, including, but not limited to, the unencumbered balance of the [Housing Fund] of a former redevelopment agency.' The Dissolution Law requires successor agencies to retain licensed accountants 'to conduct a due diligence review to determine the unobligated balances available for transfer to taxing entities' that are (1) held in the Housing Fund, and (2) former redevelopment agency assets held by the

successor agency in any other form or fund. (§ 34179.5, subds. (a), (c)(1)-(5).) The successor agency must review and approve each due diligence review, followed by review and approval by DOF. (§ 34179.6.) Under section 34179.6, DOF has the prerogative to adjust the amounts deemed unencumbered. (§ 34179.6, subds. (c) & (d).) The successor agencies then remit the unencumbered moneys to the county auditor-controller, who transfers the moneys to the taxing entities. (§ 34179.6, subd. (f).)" (*Cuenca*, *supra*, 8 Cal.App.5th at pp. 210-212, italics omitted.)

### *The Four Third Party Contracts Remaining in Contention*

As pertinent to this case, the City entered into almost 50 contracts with third parties before January 3, 1989. January 3, 1989, is the date of the earliest of seven cooperation agreements between the City and its redevelopment agency in which the City promised to advance money for capital improvements subject to repayment by its redevelopment agency. Each of these cooperation agreements listed the dollar amount to be advanced by the City. Some third party contracts were signed after January 3, 1989, but before the cooperation agreements between the City and its redevelopment agency in which those third party contracts are mentioned.

The City acknowledges there are only four of these third party contracts that postdate their cooperation agreements. The City recognizes that this case is governed by our decision in *City of Brentwood*, *supra*, 54 Cal.App.5th 418. The City limits its arguments to these four third party contracts: (1) Yorba Avenue Storm Drain Project (Yorba project), (2) Riverside Drive/Monte Vista Avenue Signal and Street Realignment Project (Riverside project), (3) Water Transmission Mains Project under the January 1989 Cooperation Agreement (January water transmission project), and (4) Water Transmission Mains Project under the September 1989 Cooperation Agreement (September water transmission project). For this reason, we focus only on these four projects.

6

In February 2011, the City assumed its role as successor agency to its redevelopment agency.  On May 1, 2014, the successor agency received a finding of completion from DOF, which allowed the City to place enforceable obligations in the recognized obligation payment schedule (ROPS) upon approval by the successor agency's oversight board.  The City adopted a resolution approving the cooperation agreements – including the four projects at issue in this appeal.  The City then included the cooperation agreements in its ROPS submission to DOF.  DOF rejected the obligations purportedly made under the cooperation agreements as enforceable obligations.

### Petition for Writ of Mandate

Seeking to set aside DOF's denial of its claims under the cooperation agreements, the City filed a petition for writ of mandate and complaint for declaratory and injunctive relief in May 2019.  DOF filed opposition.  The trial court heard the matter and denied the petition and complaint.  The trial court found that DOF did not abuse its discretion in rejecting for payment the third party contracts offered as enforceable obligations.  From the judgment of dismissal, the City timely filed a notice of appeal.

## DISCUSSION

### Proof of Payment Under the Third Party Contracts

The City argues that the evidence in the record adequately establishes the amounts paid to third party contractors for performing work authorized in the cooperation agreements.  We are not persuaded.

## A.

### Trial Court Findings

On appeal, we apply the substantial evidence standard of review to the trial court's factual findings in denying a petition for writ of mandate.  (*Witt Home Ranch, Inc. v. County of Sonoma* (2008) 165 Cal.App.4th 543, 551.)  Here, the trial court made the

7

following factual findings regarding the City's lack of proof regarding how much it actually paid to third parties under the cooperation agreements:

"First, [the City has] not shown how much the City actually paid to the third-party contractors. DOF notes that the contract amounts do not correspond to the amounts in the Promissory Notes, and has made an index showing the discrepancies between the estimated cost and contract amount. In some cases, these discrepancies are significant. [The City] provides no meaningful response to this objection, but notes that in many cases, projects 'go over budget' and exceed their estimate. This may be true, but it does not explain or justify vast discrepancies between the estimate and amount sought.

"Second, DOF notes that for some projects, the Cooperation Agreements allocated a percentage of the costs between the City and [its redevelopment agency]. Therefore how much the City actually paid the third parties is necessary to confirm that the City allocated the correct amounts to [its redevelopment agency]."

The trial court further found that "the Cooperation Agreements allowed the City to include its administrative and salary expenses attributable to services rendered by City staff as part of the amount owed by the [redevelopment agency]. These costs are not attributable to third-party contractors. [¶] For the foregoing reasons, [the City has] not shown how much was actually paid . . . to third party contractors for 'infrastructure' projects."

## B.

### *Proof of Payments*

Under the law governing dissolution of the redevelopment agencies, "enforceable obligations" for which DOF may authorize payment include "[a]n agreement between the former redevelopment agency and the city, county, or city and county that created the former redevelopment agency under which the city, county, or city and county that created the former redevelopment agency contracted with a third party on behalf of the former redevelopment agency for the development of infrastructure in connection with a

8

redevelopment project as identified in a redevelopment project plan and the former redevelopment agency was obligated to reimburse the city, county, or city and county that created the former redevelopment agency *for the payments made by the city*, county, or city and county to the third party." (§ 34191.4, subd. (b)(2)(C)(i), italics added.) Under section 34191.4, subdivision (b)(2)(C)(i), the City had the burden of showing to DOF the actual amount of "payments made by the city" under the cooperation agreements.

## C.

### *Yorba Project*

The first of the four projects that the City contends should have been allowed by DOF is the Yorba project. The Yorba project is listed in the January 3, 1989, cooperation agreement as having an estimated cost of $6.4 million, of which the redevelopment agency's share was to be $4.8 million. In promissory note RDA 89-2, however, the redevelopment agency's "share" of the obligation for the project is listed as only $2,392,965. And a statement of expenditures dated March 1991 listed the redevelopment agency's share of the obligation for the project as only $889,094.55. Neither promissory note explained whether the project had turned out to be less expensive than anticipated, the City assumed a greater share of the costs, or provided some other explanation for the change in the redevelopment agency's indebtedness for the Yorba project.

The trial court noted that the division of costs between the City and the redevelopment agency in the cooperation agreement meant that "how much the City actually paid the third parties is necessary to confirm that the City allocated the correct amounts to the RDA." However, the record does not show evidence of actual payment for the Yorba project. Thus, the record supports the trial court's finding that the City did not show the actual amounts paid for the Yorba project.

We reject the City's argument that the DOF was bound to find that actual payments could be pieced together by considering the third party contracts and

9

supporting documents "in conjunction with the Cooperation Agreements, Infrastructure Projects Promissory Notes, [statements of indebtedness], and reconciliation statements." Under section 34177, subdivision (a)(2), the Legislature expressly gave DOF "the authority to require any documents associated with the enforceable obligations to be provided to them in a manner of their choosing." While promissory notes, agreements, and statements of indebtedness may show an amount *owed*, they do not show the amount *actually paid*. So too, the reconciliation statements in this case indicated "changes in indebtedness" that showed differences in debt amounts but not actual payments to third parties.

## D.

### *Riverside Project*

Next, we examine the Riverside project. This project was identified in the January 3, 1989, cooperation agreement as having an estimated cost of $160,000, and allocated all of the cost to the redevelopment agency. Relating to this project, the City appears to have entered into a $32,700 contract with a consultant. However, promissory note RDA 90-1 lists the redevelopment agency's "share" of the obligation for the costs of the project as only $15,672. Aside from these indications of indebtedness, the record does not establish the actual amount *paid* by the City.

## E.

### *January Water Transmission Project*

Third is the January water transmission project. The January 3, 1989, cooperation agreement estimated the cost of $1.34 million, of which the redevelopment agency was to pay $536,000. Promissory note RDA 89-1 listed the redevelopment agency's share of the costs for the project as being only $110,192. Then, promissory note RDA 89-2 lists the redevelopment agency's costs for the January water transmission project as being $330,576. The record does not explain the discrepancies between the various cost amounts for the January water transmission project. While the record contains various

10

forms of promises to pay, it does not show proof of actual payment. The trial court correctly concluded the City had not met its burden of proof regarding the January water transmission project.

**F.**

*September Water Transmission Project*

The last of the four is the September water transmission project. The September 19, 1989, cooperation agreement lists this project as having a total estimated cost of $237,308. Of this total estimated cost, the redevelopment agency was to pay $23,731 from project area 1 and $71,192 from project area 2 – for a total of $94,923. Promissory note 90-1, however, lists the redevelopment agency's share of the costs for project area 1 as $15,040.30. Promissory note 90-2 lists the amount to be paid by the redevelopment agency for project area 2 as $45,120.90. As with the other water transmission project, the record does not explain the discrepancies between the amounts to be paid by the City's redevelopment agency. And, the record does not establish how much the City actually paid for this project.

In sum, the record supports the trial court's factual finding that the City had not demonstrated how much was actually paid to third parties under the cooperation agreements between the City and its redevelopment agency.[4]

---

[4]     Our conclusion that the trial court did not err in finding a lack of evidence to support proof of actual payment as required by section 34191.4, subdivision (b)(2)(C)(i), obviates the need to consider the City's other contentions. Having failed to meet the payment requirement of subdivision (b)(2)(C)(i) of section 34191.4, any ability of the City to satisfy the other prongs of this subdivision cannot qualify the obligations as enforceable agreements.

11

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

  /s/  
HOCH, J.

We concur:

  /s/  
RAYE, P. J.

  /s/  
KRAUSE, J.